T.C. Memo. 2021-132

UNITED STATES TAX COURT

901 SOUTH BROADWAY LIMITED PARTNERSHIP, STANDARD
DEVELOPMENT, LLC, TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14179-17.                    Filed November 23, 2021.

PS, a partnership, granted to C, a "qualified organization" within the meaning of I.R.C. sec. 170(h)(3), a facade easement on Building, a "certified historic structure" within the meaning of I.R.C. sec. 170(h)(4)(C)(ii). Lenders were beneficiaries of deeds of trust on Building which secured loans made to PS. The deeds of trust require the lenders, in some circumstances, to allow insurance proceeds arising from damage to Building or the proceeds from its condemnation to be used to repair or restore Building. In other circumstances, the lenders can apply those proceeds to satisfy the indebtedness secured by the deeds of trust. The easement deed provides that, in the event of casualty or condemnation, PS and C are entitled to share any net proceeds remaining after the satisfaction of "prior claims".

P, PS' tax matters partner, moved for summary judgment that PS' gift to C satisfied the requirement of I.R.C. sec. 170(h)(5)(A) that the gift's conservation purposes be protected in perpetuity. R opposed P's motion on the ground that the lenders' interests in Building had

[*2]  not been subordinated as required by sec. 1.170A-14(g)(2), Income Tax Regs.  After denying P's motion for summary judgment, we ordered P to show cause why we should not enter decision in R's favor.

Held:  Sec. 1.170A-14(g)(2), Income Tax Regs., requires the subordination of any priority right of a lender to use insurance or condemnation proceeds to satisfy the secured indebtedness in circumstances that have a material chance of arising.

Held, further, the circumstances in which the lenders can use insurance or condemnation proceeds to apply to PS' indebtedness, which are specifically addressed in the relevant documents, have a material chance of arising.  See Palmolive Bldg. Inv'rs, LLC v. Commissioner, 149 T.C. 380, 403-404 (2017).

Held, further, the priority rights to insurance or condemnation proceeds granted to the lenders in the deeds of trust are "prior claims" within the meaning of the relevant provisions of the easement deed; consequently, the lenders' rights in Building were not subordinated to C's rights, as required by sec. 1.170A-14(g)(2), Income Tax Regs., and the show cause order will be made absolute.

Held, further, to the extent that the principle of party presentation applies at all to a partnership proceeding brought under I.R.C. sec. 6226, it gives a court broad latitude to determine partnership items and does not limit the court's consideration to specific arguments advanced by the parties.

[*3]  Jeffrey H. Paravano, Michelle M. Hervey, and Katherine L. McKnight, for petitioner.

Deborah Aloof, Anita A. Gill, Sebastian Voth, Jeffrey E. Gold, and Sarah C. Nadel, for respondent.


MEMORANDUM OPINION


HALPERN, Judge:  In this case, we review a notice of final partnership administrative adjustment (FPAA) in which respondent denied a deduction reported by 901 South Broadway Limited Partnership (partnership) for its contribution to the Los Angeles Conservancy (Conservancy) of a facade easement on a building at 901 South Broadway Avenue, Los Angeles, California (Building). In August 2019, petitioner moved for partial summary judgment that, among other things, the conservation purposes of its gift to the Conservancy were protected in perpetuity, as required by section 170(h)(5)(A).[1]  In an order dated April 27, 2021 (April 27 order), we denied petitioner's motion because petitioner had not demonstrated that the beneficiaries of deeds of trust encumbering the Building

---

[1]All section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

**[*4]** (Lenders) had subordinated their rights in the property to the Conservancy's right to enforce the gift's conservation purposes, as required by section 1.170A-14(g)(2), Income Tax Regs. After we denied petitioner's motion, the parties continued to prepare for a potentially lengthy trial that would address the easement's value and other unresolved issues. The April 27 order, however, suggested that the time and potential expense of trial might be unnecessary to our disposition of the case. Therefore, in the exercise of our responsibility to manage our proceedings efficiently, we issued an order dated July 23, 2021 (show cause order), directing petitioner to show cause why we should not enter decision in respondent's favor because of the partnership's failure to meet the subordination requirement of section 1.170A-14(g)(2), Income Tax Regs.[2] Both parties have responded to the show cause order, and petitioner has submitted a supplement to its initial response. After considering the arguments made in the parties' responses, we conclude that, because (1) the deeds of trust encumbering the Building provide

---

[2]Our issuance of the show cause order may be analogized to a court's entering summary judgment sua sponte under Fed. R. Civ. P. 56(f). Although our own Rule dealing with summary judgment, Rule 121, does not include a parallel to Fed. R. Civ. P. 56(f), our Rule 1(b) provides: "Where in any instance there is no applicable rule of procedure, the Court or the Judge before whom the matter is pending may prescribe the procedure, giving particular weight to the Federal Rules of Civil Procedure to the extent that they are suitably adaptable to govern the matter at hand."

[*5] the Lenders with a priority right to use the proceeds of insurance or condemnation, in specified circumstances, to satisfy the indebtedness secured by the deeds of trust, and (2) the Lenders did not subordinate those priority rights to the right of the Conservancy to enforce in perpetuity the conservation purposes of the partnership's gift of the easement, that gift was not deductible under section 170. Accordingly, we will make the show cause order absolute and enter decision in respondent's favor.

## Background

When the partnership granted the easement to the Conservancy, the underlying property was subject to five deeds of trust securing loans made to the partnership. Those loans had been made by three different lenders: GMAC Commercial Mortgage Corp. (GMAC), the City of Los Angeles (City), and the City's Community Redevelopment Agency (Agency) (collectively, Lenders).

The deeds of trust fall into two categories: (1) the two deeds of trust in favor of GMAC and (2) the deeds of trust in favor of the City or the Agency (City deeds of trust). The language of the separate deeds in each category is, in all material respects, identical.

Section 7 of each of the GMAC deeds of trust requires the partnership to insure the Building and provides:

**[*6]**  [I]f the premises covered hereby, or any part thereof, shall be damaged by fire or other hazard against which insurance is held * * * the amounts paid by any insurance company in pursuance of the contract of insurance to the extent of the indebtedness then remaining unpaid, shall be paid to the Beneficiary [Lender] and, at its option, may be applied to the debt or released for the repairing or rebuilding of the premises.

Section 21 of each of the GMAC deeds of trust provides:

> Should the property or any part thereof be taken or damaged by reason of any public improvement or condemnation proceeding, or damaged by fire, or earthquake, or in any other manner, the Beneficiary shall be entitled to all compensation, awards, and other payment or relief therefor * * *.  All awards of compensation in connection with condemnation for public use of or taking of any of that property, shall be paid to the Beneficiary to be applied to the amount due under the Note secured hereby in (1) amounts equal to the next maturing installment or installments of principal and (2) with any balance to be credited to the next payment due under the Note.  All awards of damages in connection with any condemnation for public use of or injury to any residue of that property, shall be paid to the Beneficiary to be applied to a fund held for and on behalf of the Trustor [the partnership] which fund shall, at the option of the Beneficiary, and with the prior approval of the Secretary of Housing and Urban Development, either be applied to the amount due under the Note as specified in the preceding sentence, or be disbursed for the restoration or repair of the damage to the residue.  * * *

Section 16 of the City deeds of trust addresses the use of insurance proceeds paid

for the damage or destruction of the Building.  That section provides:

**[*7]**  If any building or improvements erected on the Property is [sic] damaged or destroyed by an insurable cause, Trustor shall, at its cost and expense, repair or restore said buildings and improvements consistent with the original plans and specifications.  * * *  All insurance proceeds collected for such damage or destruction shall be applied to the cost of such repairs or restoration and, if such insurance proceeds shall be insufficient for such purpose, Trustor shall make up the deficiency.

Section 21 of the City deeds of trust addresses condemnation, providing:

>  All judgments, awards of damages, settlements and compensation made in connection with or in lieu of taking all or any part of or interest in the Security under assertion of the power of eminent domain ("Funds") are hereby assigned to and shall be paid to Beneficiary.  Beneficiary is authorized (but not required) to collect and receive any Funds and is authorized to apply them in whole or in part upon any indebtedness or obligation secured hereby, in such order and manner as Beneficiary shall determine at its sole option.  All or any part of the amounts so collected and recovered by Beneficiary may be released to Trustor upon such conditions as Beneficiary may impose for its disposition.  * * *

>  Notwithstanding anything to the contrary set forth herein, Beneficiary shall, prior to the application of the Funds or any portion thereof to the indebtedness or other obligations, apply such portion of the Funds as is reasonable and necessary to repair and preserve the value, marketability and rentability of the Security.

The partnership's contribution to the Conservancy is evidenced by a deed of historic preservation and conservation easement dated November 1, 2007.  Section 3.1 of the easement deed prohibits the partnership, as Grantor, from making changes to the Building without the "prior express written approval" of the Conservancy (Grantee).  Section 3.2(c) requires the Conservancy to act within 30

**[\*8]** days of a request by the partnership and provides that the Conservancy's failure to act within that period "shall be deemed to constitute approval of Grantor's request."

Section 7.3(a) of the easement deed requires the partnership to maintain casualty insurance on the Building. Section 7.3(d) provides: "Whenever the Property is encumbered with a mortgage or deed of trust, nothing contained in this Section shall jeopardize the prior claim, if any, of any Lender to the insurance proceeds."

Section 9.7 of the easement deed acknowledges the deeds of trust that encumbered the Building and further provides:

> Concurrently herewith, each of GMAC, the City and the Agency have agreed, by separate instrument (in the forms set forth in Exhibit C, Exhibit D, and Exhibit E attached hereto) which shall be recorded concurrently with the recordation of this Easement, to subordinate its rights in the Project to this Easement to the extent necessary to permit Grantee to enforce the purpose of the Easement in perpetuity and to prevent any extinguishment of this Easement by the lien holder thereof.

Section 11.1 of the easement deed addresses the allocation of proceeds between the Conservancy and the partnership if the easement is extinguished or the property subject to the easement is condemned (circumstances that are further addressed by sections 11.2 and 11.3 of the deed, respectively). Section 11.1 provides that the Conservancy and the partnership each have an interest in the

[*9] subject property with a stipulated percentage interest in the property's fair market value. The Conservancy's percentage interest in the property is "the ratio of the value of the Easement to the value of the Property unencumbered by the Easement", determined as of the easement's effective date. The partnership's percentage interest in the property is, by implication, the complement of the Conservancy's percentage interest.

Section 11.2 of the easement deed provides:

> **Extinguishment.** Grantor and Grantee hereby recognize that circumstances may arise that may make the continued ownership or use of the Property in a manner consistent with the Purpose of this Easement impossible and that extinguishment of the Easement may be necessary. Such circumstances may include, but are not limited to, partial or total destruction of the Building resulting from casualty. Extinguishment must be the result of a judicial proceeding in a court of competent jurisdiction. Unless otherwise required by applicable law at the time, in the event of any sale of all or a portion of the Property (or any other property received in connection with an exchange or involuntary conversion of the Property) after such termination or extinguishment, and after the satisfaction of prior claims and any costs or expenses associated with such sale, Grantor and Grantee shall share in any net proceeds resulting from such sale in accordance with their respective percentage interests in the fair market value of the Property, as such interests are determined under the provisions of Section 11.1, adjusted, if necessary, to reflect a partial termination or extinguishment of this Easement. All such proceeds received by Grantee shall be used by Grantee in a manner consistent with Grantee's primary purposes. Net proceeds shall also include, without limitation, net insurance proceeds. In the event of extinguishment, the provisions of this Section shall survive extinguishment and shall constitute a lien on the Property with the same effect and priority as a mechanic's lien, except such lien shall

**[*10]** not jeopardize the priority of any recorded lien of mortgage or deed of trust given connection [sic] with a promissory note secured by the Property.

And section 11.3 provides:

> **Condemnation.** If all or any part of the property is taken under the power of eminent domain by public, corporate, or other authority, or otherwise acquired by such authority through a purchase in lieu of a taking, and subject to the rights of any Lender,[3] Grantor and Grantee shall join in appropriate proceedings at the time of such taking to recover the full value of those interests in the Property that are subject to the taking and all incidental and direct damages resulting from the taking. After the satisfaction of prior claims and net of expenses reasonably incurred by Grantor and Grantee in connection with such taking, Grantor and Grantee shall be respectively entitled to compensation from the balance of the recovered proceeds in conformity with the provisions of Sections 11.1 and 11.2 unless otherwise provided by law.

Section 13.2 of the easement deed provides: "Grantor and Grantee agree that Grantor shall not undertake, and Grantee shall not permit, any change to the exterior of the Building which would be inconsistent with the historical character of such exterior."

Section 1 of each subordination agreement provides as follows:

> Terms of Subordination. In the event of foreclosure of the liens of the Deeds of Trust or deed in lieu of foreclosure with respect to the

---

[3]Section 9.7 of the easement deed provides: "For the purposes of this Easement, the term 'Lender' shall mean any of GMAC, the City and the Agency and other entity which holds a valid mortgage or deed of trust encumbering the Property."

[*11] Property, the Easement shall not extinguish and the covenants, conditions and restrictions set forth therein shall survive any foreclosure or deed in lieu of foreclosure, subject to the following: (i) Lender and its assignees which are the holder or beneficiary of the Deeds of Trust (together with Lender, a "Beneficiary") shall have a prior claim to all insurance proceeds as a result of any casualty, hazard, or accident occurring to or about the Property and all proceeds of condemnation proceedings, and shall be entitled to same in preference to Grantee until the Deeds of Trust are paid off and discharged, notwithstanding that the Deeds of Trust are subordinate in priority to the Easement; (ii) if a Beneficiary receives an assignment of the leases, rents, and profits of the Property as security or additional security for a loan secured by the Deeds of Trust, then the Beneficiary shall have a prior claim to the leases, rents, and profits of the Property and shall be entitled to receive same in preference to Grantee until the Beneficiary's debt is paid off or otherwise satisfied, notwithstanding that the Deeds of Trust are subordinate in priority to the Easement, provided, however, that if the Easement is extinguished under the circumstances described in Sections 11.2 of the Granting Deed, Grantee shall be entitled to compensation in accordance with the terms set forth therein; and (iii) a Beneficiary or purchaser in foreclosure shall have no obligation, debt, or liability under the Easement until the Beneficiary or a purchaser in foreclosure owns the Property. Nothing contained in this Agreement shall be construed to give any Lender or Beneficiary the right to violate the terms of the Easement or to extinguish this Easement by taking title to the Property by foreclosure or otherwise.

Those involved in drafting the easement deed and the subordination agreements on behalf of the partnership relied on the Model Historic Preservation and Conservation Easement published by the National Trust for Historic

**[*12]** Preservation (Model Easement). Paragraph 23.2 of the Model Easement is identical in all material respects to section 11.2 of the deed governing the partnership's gift to the Conservancy. Paragraph 23.3 of the Model Easement is identical in all material respects to section 11.3 of the partnership's easement deed, except that the phrase "and subject to the rights of any Lender", which appears in the first sentence of the partnership's deed, does not appear in the analogous Model Easement provision.

The Model Easement includes an additional paragraph (numbered 26) to be used "as applicable" to address mortgage subordination. That paragraph provides as follows:

> **Subordination of Mortgage.** At the time of the conveyance of this Easement, the Property is subject to a Mortgage/Deed of Trust dated ___, recorded in the Land Records of [county] at Book/Liber ___, Page/Folio ___ (hereinafter "the Mortgage"/"the Deed of Trust") held by _____ (hereinafter, "Mortgagee"/"Lender"). The Mortgagee/Lender joins in the execution of this Easement to evidence its agreement to subordinate the Mortgage/the Deed of Trust to this Easement under the following conditions and stipulations:
>
> (a) The Mortgagee/Lender and its assignees shall have a prior claim to all insurance proceeds as a result of any casualty, hazard, or accident occurring to or about the Property and all proceeds of condemnation proceedings, and shall be entitled to the same in preference to Grantee until the Mortgage/the Deed of Trust is paid off and discharged, notwithstanding that the Mortgage/the Deed of Trust is subordinate in priority to the Easement; provided, however, that if the Easement is terminated under the circumstances described in

[*13] Paragraphs 23.2 and 23.3, Grantee shall be entitled to compensation in accordance with the terms set forth therein.

(b) If the Mortgagee/Lender receives an assignment of the leases, rents, and profits of the Property as security or additional security for the loan secured by the Mortgage/Deed of Trust, then the Mortgagee/Lender shall have a prior claim to the leases, rents, and profits of the Property and shall be entitled to receive the same in preference to Grantee until the Mortgagee's/Lender's debt is paid off or otherwise satisfied, notwithstanding that the Mortgage/Deed of Trust is subordinate in priority to the Easement.

(c) The Mortgagee/Lender or purchaser in foreclosure shall have no obligation, debt, or liability under the Easement until the Mortgagee/Lender or a purchaser in foreclosure under it obtains ownership of the Property. In the event of foreclosure or deed in lieu of foreclosure, the Easement is not extinguished.

(d) Nothing contained in this paragraph or in this Easement shall be construed to give any Mortgagee/Lender the right to violate the terms of this Easement or to extinguish this Easement by taking title to the Property by foreclosure or otherwise.

On its Form 1065, U.S. Return of Partnership Income, for the taxable year ended December 31, 2007, the partnership, whose principal place of business is Los Angeles, California, reported a deduction of $20,010,000 for its contribution to the Conservancy of the facade easement on the Building. The FPAA disallowed that deduction and also determined accuracy-related penalties. As the basis for its denial of the deduction the partnership claimed for its contribution of the easement, the FPAA states, among other things, that "[i]t has not been established that all [of] the requirements of I.R.C. Section 170 and the regulations promulgated there under

**[*14]** have been satisfied for the non-cash charitable contribution of a qualified conservation contribution."

In June 2017, we received a petition for readjustment of partnership items, in which petitioner assigned error to each of the FPAA's determinations. In particular, paragraph 6(a) of the petition assigned error to "[t]he Commissioner's determination that the charitable contribution of a qualified conservation easement did not meet the requirements of IRC Section 170". In his answer, respondent admitted that he made that determination but denied that he had erred in doing so.

Discussion

I.   Applicable Law

Section 170(a)(1) allows a deduction for "any charitable contribution * * * payment of which is made within the taxable year." Section 170(c) defines the term "charitable contribution" to mean "a contribution or gift to or for the use of" a specified organization. As a general rule, a taxpayer is not allowed a deduction for a contribution of part of the taxpayer's interest in property. See sec. 170(f)(3). That general rule does not apply, however, to "a qualified conservation contribution." Sec. 170(f)(3)(B)(iii).

[*15] Section 170(h)(1) defines "qualified conservation contribution" to mean "a contribution--(A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes." The term "qualified real property interest" includes "a restriction (granted in perpetuity) on the use which may be made of * * * real property." Sec. 170(h)(2)(C). Under section 170(h)(5)(A), the contribution of a qualified real property interest will not be treated as having been made exclusively for conservation purposes "unless the conservation purpose is protected in perpetuity."

When property covered by a conservation easement is subject to one or more mortgages, satisfaction of section 170(h)(5)(A) requires that the mortgagees' rights in the property be subordinated to those of the donee. Section 1.170A-14(g)(2), Income Tax Regs., provides:

> In the case of conservation contributions made after February 13, 1986, no deduction will be permitted under this section for an interest in property which is subject to a mortgage unless the mortgagee subordinates its rights in the property to the right of the qualified organization to enforce the conservation purposes of the gift in perpetuity. For conservation contributions made prior to February 14, 1986, the requirement of section 170(h)(5)(A) is satisfied in the case of mortgaged property (with respect to which the mortgagee has not subordinated its rights) only if the donor can demonstrate that the conservation purpose is protected in perpetuity without subordination of the mortgagee's rights.

**[*16]** Section 1.170A-14(g)(3), Income Tax Regs., provides: "A deduction shall not be disallowed under section 170(f)(3)(B)(iii) and this section merely because the interest which passes to, or is vested in, the donee organization may be defeated by the performance of some act or the happening of some event, if on the date of the gift it appears that the possibility that such act or event will occur is so remote as to be negligible."

Section 1.170A-14(g)(6)(i), Income Tax Regs., acknowledges the possibility that an "unexpected change in the conditions" can render "impossible or impractical" the continued fulfillment of the purposes of the gift of a conservation easement. The prospect of those circumstances' arising does not require denial of a deduction for the gift as long as two conditions are met. First, the easement must be "extinguished by judicial proceeding". Id. And second, the donee must receive a share of the proceeds specified in section 1.170A-14(g)(6)(ii), Income Tax Regs., and use those proceeds "in a manner consistent with the conservation purposes of the original contribution." Id. subdiv. (i). Section 1.170A-14(g)(6)(ii), Income Tax Regs., provides:

> In case of a donation made after February 13, 1986, for a deduction to be allowed under this section, at the time of the gift the donor must agree that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the donee organization, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the

[*17] time of the gift, bears to the value of the property as a whole at that time.  * * *  For purposes of this paragraph (g)(6)(ii), that proportionate value of the donee's property rights shall remain constant.  Accordingly, when a change in conditions give[s] rise to the extinguishment of a perpetual conservation restriction under paragraph (g)(6)(i) of this section, the donee organization, on a subsequent sale, exchange, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction, unless state law provides that the donor is entitled to the full proceeds from the conversion without regard to the terms of the prior perpetual conservation restriction.

In Palmolive Bldg. Inv'rs, LLC v. Commissioner, 149 T.C. 380, 394-395 (2017), we addressed a charitable contribution deduction claimed for a facade easement created by a deed that provided that each holder of a mortgage on the subject property "shall have a prior claim to * * * insurance and condemnation proceeds and shall be entitled to same in preference to Grantee until the mortgage is paid off and discharged, notwithstanding that the mortgage is subordinate in priority to" the conservation right granted by the easement.  The Commissioner argued that the deed in issue did not satisfy the requirement of section 170(h)(5)(A).  In particular, the Commissioner argued that lenders' priority right to insurance or condemnation proceeds "render[ed] the subordinations of * * * [the mortgagees] insufficient to satisfy section 1.170A-14(g)(2)".  Id. at 393.  We agreed.  "The easement donee", we wrote, "is * * * not assured in perpetuity of its right to insurance or condemnation proceeds, but instead is given a contingent

**[\*18]** prospect of receiving proceeds only if the eventual value of the property permits it or if the mortgagee agrees to suffer loss, to forfeit the repayment of its loan, and to gratuitously let the donee move to the front of the line." Id. at 404-405.

## II.    Prior Proceedings

Our resolution of the mortgage subordination issue--and thus the case as a whole--in respondent's favor is the culmination of a lengthy series of proceedings. Understanding the conclusion we now reach may be facilitated by a review of the path that has brought us to the present juncture.

### A.    Resolution of Penalty Issue

In October 2018, the parties filed a stipulation stating their agreement that no accuracy-related penalty would apply to any underpayments of tax by partners in the partnership as a result of the disallowance of all or part of the deduction the partnership reported for its contribution of the easement to the Conservancy. The October 2018 stipulation also listed two issues "remaining * * * in this case", the first of which was "[w]hether petitioner [actually, the partnership] is entitled to a charitable contribution deduction in connection with the donation of a conservation easement during the 2007 tax year".

[*19] B.    <u>Summary Judgment Motions</u>

In November 2018, respondent moved for summary judgment in regard to the satisfaction of section 170(h)(2)(C) and (5)(A).[4] The memorandum of law respondent submitted in support of his motion for summary judgment focused on the deemed approval provision in section 3.2(c) of the easement deed.

In August 2019, petitioner responded to respondent's motion for summary judgment and also filed its own motion for partial summary judgment seeking a ruling that "the perpetuity requirements of Sections 170(h)(2)(C) and 170(h)(5)(A)" had been satisfied. The memorandum of law petitioner submitted in opposition to respondent's motion and in support of its own motion also focused on the deemed approval provision in the easement deed. Neither petitioner's motion nor its accompanying memorandum of law made any mention of the mortgage subordination requirement of section 1.170A-14(g)(2), Income Tax Regs.

---

[4]A prior motion for partial summary judgment in respondent's favor on the same issue had been denied without prejudice.

**[\*20]** C.   Denial of Respondent's Motion for Summary Judgment and
         Subsequent Remote Hearing

On November 19, 2020, we denied respondent's motion for summary judgment, reasoning that, by reason of section 13.2 of the easement deed, the deemed approval provision of section 3.2(c) did not apply to "requests to change the Building's exterior in a manner that would alter its historical character".  In the order denying respondent's motion, we stated that we would address separately petitioner's motion for partial summary judgment.  In a separate order, issued the following day, we posed a series of questions about respondent's position intended "to facilitate resolution of this matter".  The sixth of those questions was:  "Does respondent claim that the contribution of the easement violates section 170(h)(5)(A)'s perpetual protection requirement for reasons other than the deemed approval provision?"

We discussed our questions with the parties at a remote hearing on January 6, 2021.  In regard to the sixth question, respondent's counsel referred to an issue as to compliance with the mortgage subordination requirement.

D.   Second Stipulation of Settled Issues

Shortly after the remote hearing, in an order filed January 8, 2021 (January 8 order), we directed the parties to submit two stipulations.  The first stipulation, due January 22, 2021, was to be a stipulation of settled issues, which we expected to

[*21] address, at a minimum, those issues that respondent's counsel indicated during the remote hearing were not in dispute. The second stipulation, due February 22, 2021, we described as "a stipulation that lists and provides a brief explanation of any issues raised by the FPAA in regard to which the parties are unable to reach agreement." The January 8 order further required that "any trial of the case shall be limited to those issues stipulated as being unagreed unless the party who seeks to raise one or more additional issues establishes good cause for their omission from the stipulation of unagreed issues."

On January 21, 2021, in accordance with the January 8 order, the parties submitted their second stipulation of settled issues. That stipulation addressed the issues implicated by four of the six questions posed in our order of November 20, 2020. Among other things, the parties agreed that (1) "[t]he contributed easement is a 'qualified real property interest' within the meaning of I.R.C. § 170(h)(2)(C)", (2) the "Conservancy is a qualified organization within the meaning of I.R.C. § 170(h)(3)", and (3) the Building "is a 'certified historic structure' within the meaning of I.R.C. § 170(h)(4)(C)(ii)". Left unaddressed were certification and reporting requirements provided in section 170(h)(4)(B)(ii) and (iii) and section 170(h)(5)(A)'s perpetual protection requirement.

**[\*22]** E.     Respondent's Supplement to Response to Petitioner's Motion for
Partial Summary Judgment; Stipulation of Unagreed Issues

In an order issued January 29, 2021 (January 29 order), after we received the parties' second stipulation of settled issues and in light of the discussion at the remote hearing, we invited respondent to move for leave to supplement his response to petitioner's motion for partial summary judgment, provided that he do so by February 5, 2021. That order stated that, if respondent were to file such a motion and we were to grant the motion, we would then give petitioner 30 days to respond to respondent's supplemental response.

On the designated due date, February 5, 2021, respondent submitted his motion for leave. In that motion, respondent stated that he sought to supplement his initial response to petitioner's motion for partial summary judgment to address legal and factual issues concerning the adequacy of the subordination of the interests in the Building of the holders of mortgages on the property to the Conservancy's rights in the property.[5] Petitioner opposed respondent's motion for

---

[5]The Lenders' security interests in the Building actually take the form of deeds of trust rather than mortgages. While mortgages and deeds of trust are separate means of using property to secure a loan, "in California there is little practical difference" between the two types of security interests. RNT Holdings, LLC v. United Gen. Title Ins. Co., 179 Cal. Rptr. 3d 175, 181 n.5 (Ct. App. 2014) (quoting Domarad v. Fisher & Burke, Inc., 76 Cal. Rptr. 529, 535 (Ct. App. 1969)). The parties have used the two terms interchangeably, as have we.

[*23] leave, accusing him of attempting to "raise an entirely new theory".  Among other things, petitioner argued that what it characterized as respondent's "new, very late legal theory * * * includes a completely new nucleus of factual considerations that have undergone no development whatsoever."  Were we to grant respondent's motion for leave, petitioner contended, a "myriad of new factual questions * * * would need to be addressed".  Among those "complex factual issues" were "whether certain agreements were executed, when that occurred, whether they took legal effect as a matter of California law, and what they mean."

On February 22, 2021, also in accordance with our January 8 order, the parties submitted a Stipulation of Issue for Trial and Notice of Unresolved Issues for Which No Stipulation is Possible (February 22 stipulation).  The February 22 stipulation stated the parties' agreement that the issue of the easement's value remained for trial.  The balance of the February 22 stipulation consists of separate "statements" by each party.  In petitioner's view, the easement's value was the only issue that remained for trial.  Respondent, however, identified four additional issues, including:  "Whether the Deeds of Trust encumbering the building were

Following that practice, we will sometimes refer to the deeds of trust in this report as mortgages and to the Lenders as mortgagees.

[*24] properly subordinated, as required by I.R.C. § 170(h)(5)(A) and Treas. Reg. § 1.170A-14(g)(2), at the time of the donation."

In an order dated February 26, 2021 (February 26 order), we granted respondent's motion for leave to supplement his response to petitioner's motion for partial summary judgment. We disagreed with petitioner that respondent sought to raise a new issue. As we explained: "The issue of whether the holders of mortgages on the Building had adequately subordinated their rights in the property to those of the Conservancy has been at issue in the case from the beginning. The FPAA and the parties' pleadings put in issue all of the requirements of section 170 and its accompanying regulations." In fact, as petitioner acknowledged in its opposition to respondent's motion for leave, the mortgage subordination issue was encompassed within its motion for partial summary judgment. "Indeed," we observed in the February 26 order, "one of the purposes of petitioner's motion appears to have been to take the mortgage subordination issue 'off the table'." We concluded:

> Petitioner cannot fairly complain of inadequate notice of an issue that was encompassed in the FPAA, encompassed in the pleadings, not addressed in any prior stipulation, and even encompassed--apparently by design--within the very motion for partial summary judgment that is now before us. Petitioner's argument boils down to the paradoxical assertion that neither respondent nor we, on our own initiative, are allowed to raise the very issue on which it seeks a ruling.

**[*25]** After we granted respondent's motion for leave, we accepted his supplement to petitioner's motion for partial summary judgment. In that supplement, respondent argued that we should deny petitioner's motion for partial summary judgment for two reasons. First, respondent claimed that petitioner had not demonstrated that the subordination agreements attached as exhibits to the easement deed had in fact been executed contemporaneously with the execution of the deed.[6] Second, respondent claimed that, even if those agreements were timely executed, they were inadequate to effect the subordination required by section 1.170A-14(g)(2), Income Tax Regs. Respondent pointed to clause (i) of section 1 of each agreement, in which, under his reading, each lender retained a priority right, in preference to the Conservancy, to secure satisfaction of its loan from the proceeds of insurance policies covering the property, in the event of casualty, and to any proceeds paid on the condemnation of the Building. Respondent argued that, "[i]n all material respects," the language of clause (i) of section 1 of the subordination agreements "is the same language found inadequate in Palmolive Building Investors, LLC, in that the Lenders have a prior claim, in preference to

_____

[6]In his response to the show cause order, respondent allowed that he "is not purs[u]ing the argument that the Subordination Agreements were not in place at the time of the donation."

**[*26]** the Grantee, to all insurance proceeds as a result of any casualty, hazard, or accident occurring to or about the Property and all proceeds of condemnation proceedings until the deeds of trust are paid off and discharged."

Although petitioner, in trying to prevent respondent from raising the mortgage subordination issue, asserted that the issue would present a "myriad of new factual questions", petitioner nonetheless continued to pursue its motion for summary judgment after we granted respondent's motion for leave. In accordance with the January 29 order, we allowed petitioner to respond to respondent's supplement. Petitioner did not explain how the myriad complex factual questions it referred to in opposing respondent's motion for leave had managed to resolve themselves without any further stipulation by the parties. Implicitly asserting the absence of any genuine questions of material fact, petitioner advanced four legal arguments. First, relying on the proviso in clause (ii) of section 1 of the subordination agreements executed by the Lenders, petitioner sought to distinguish the facts of its case from those of Palmolive Bldg. Inv'rs. Second, petitioner challenged the authority of Palmolive Bldg. Inv'rs, invoking Kaufman v. Shulman (Kaufman III), 687 F.3d 21 (1st Cir. 2012), aff'g in part, vacating in part, and remanding Kaufman v. Commissioner, 134 T.C. 182 (2010). Third, petitioner claimed that the Lenders' rights to insurance or condemnation proceeds were

**[\*27]** limited by California caselaw. And fourth, petitioner challenged the validity of section 1.170A-14(g)(2) and (6), Income Tax Regs.

F.    Denial of Petitioner's Motion for Partial Summary Judgment

The April 27 order rejected each of the four arguments petitioner advanced in its response to respondent's supplement. First, we observed that the proviso on which petitioner relied to distinguish its case from Palmolive Bldg. Inv'rs appeared in clause (ii) of section 1 of the subordination agreements, dealing with assignments of leases, rents and profits, rather than in clause (i), which refers to the Lenders' priority rights to insurance or condemnation proceeds. To advance its argument, petitioner had "resort[ed] to a selective and misleading quotation of section 1" that made it appear as though the proviso appeared in clause (i) rather than clause (ii). We also noted that section 11.2 of the easement deed "provides that, in the event that the Building is sold after termination or extinguishment of the easement, the Conservancy's rights to proceeds * * * [would be] subject to 'the satisfaction of prior claims'" (a qualification that petitioner had not acknowledged). We observed that the same qualifying phrase regarding the satisfaction of prior claims also appears in section 11.3 of the easement deed, dealing with condemnation, and that "[t]he right accorded to the partnership and the Conservancy by that section to join in * * * [a] condemnation proceeding and

**[*28]** recover the value of their interests in the property is expressly 'subject to the rights of any Lender'."

Second, regarding the authority of Palmolive Bldg. Inv'rs, we reminded petitioner of this Court's established practice of following its own precedents and deferring to contrary precedent of a particular court of appeals only to avoid "inevitable" reversal. See Lardas v. Commissioner, 99 T.C. 490, 494-495 (1992); Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971); Lawrence v. Commissioner, 27 T.C. 713, 716-718 (1957), rev'd, 258 F.2d 562 (9th Cir. 1958). Because petitioner's case would be appealable to the Court of Appeals for the Ninth Circuit, the First Circuit's opinion in Kaufman III does not give us grounds to depart from our own precedent in Palmolive Bldg. Inv'rs.

Third, we acknowledged the California caselaw on which petitioner sought to rely and agreed that "in some circumstances", a lender might have to establish an impairment of its security as a result of a casualty or condemnation of mortgaged property to exercise a priority right to insurance or condemnation proceeds. As we explained in the April 27 order:

> California courts have relied on the covenant of good faith and fair dealing implied in any contract to limit a mortgage holder's right to insurance or condemnation proceeds. For example, Milstein v. Sec. Pac. Nat'l Bank, 27 Cal. App. 3d 482 (1972), involved the condemnation by the City of Los Angeles of a 10-foot strip of a commercial property. A deed of trust covering the property allowed

[*29] the mortgagee to either apply condemnation proceeds to the debt secured by the mortgage or instead cause them to be paid to the property owner. The court concluded that the mortgagee's discretion in exercising that choice was limited by the covenant of good faith and fair dealing implied by law. That covenant required the mortgagee "to distribute to * * * [the] borrowers all proceeds in excess of those necessary to recoup any impairment in security caused by the eminent domain proceeding." Id. at 487. Schoolcraft v. Ross, 81 Cal. App. 3d 75, 80 (1978), extended the Milstein "principle" to a case involving insurance proceeds. In Schoolcraft, 81 Cal. App. 3d at 77, the court held "that the right of the beneficiary to apply insurance proceeds to the balance of a note secured by a deed of trust must be performed in good faith and with fair dealing and that to the extent the security is not impaired the beneficiary must permit those proceeds to be used for the cost of rebuilding."

We went on to explain, however, that the courts' application of the implied duty of good faith and fair dealing to limit the lenders' priority right to insurance or condemnation proceedings rested on particular language included in the deeds of trust executed in the lenders' favor:

 [I]n Milstein, 27 Cal. App. 3d at 486, the court indicated that the result in that case would have been different had the deed of trust simply "stat[e]d that in the event of an eminent domain proceeding the condemnation shall be paid to the beneficiary to be applied upon the secured debt." Instead, the deed of trust at issue in that case allowed the mortgagee to choose between "apply[ing] the proceeds to the debt or caus[in]g them to be paid to the trustor, the debtor." Id. Similarly, the deed of trust at issue in Schoolcraft, 81 Cal. App. 3d at 78, provided that the lender could, at its option, apply the insurance proceeds to reduce the indebtedness secured by the mortgage or instead release all or part of those proceeds to the property owner. In both Milstein and Schoolcraft, the court looked to the implied duty of good faith and fair dealing to limit the discretion allowed to the mortgagee in choosing to use the condemnation or insurance proceeds

**[*30]** to either pay down the debt secured by the mortgage or instead allow those proceeds to be distributed to the debtor to repair the subject property.

In support of its motion for partial summary judgment, petitioner had not provided us with copies of the deeds of trust evidencing the Lenders' interests in the Building. Therefore, in addressing petitioner's motion, we were unable to assess the applicability of the California caselaw exemplified by <u>Milstein</u> and <u>Schoolcraft</u>. "Moreover," we noted in the April 27 order, "impairment of security would not be an issue if the Building were wholly condemned."

Finally, relying in part on our precedent in <u>Oakbrook Land Holdings, LLC v. Commissioner</u>, 154 T.C. 180 (2020), we rejected petitioner's arguments about the validity of the relevant regulations. Petitioner did not renew those arguments in either of its responses to the show cause order.

G. <u>Preparation for Trial and the Show Cause Order</u>

On May 7, 2021, we ordered the case to be "calendared for a 4-day Washington, D.C. remote Special Trial Session". We then adopted a pretrial schedule proposed by the parties. After we issued the scheduling order, a dispute arose between the parties over petitioner's compliance with the established schedule and respondent's ability to address through expert testimony an issue that petitioner viewed as having been conceded by stipulation.

[*31] We issued the show cause order without resolving that dispute by addressing

the parties' separate motions in limine. As we explained in that order:

> The scheduled length of the trial provides an indication of its expected complexity. Although the parties have been unable to agree on just what issues are and are not before us for trial, they do agree that, if nothing else, the issue of the easement's value remains for trial. The parties plan to present the testimony of at least three expert witnesses * * * in regard to that issue.

> The Court bears a responsibility to the public and to the parties who appear before it to manage its proceedings efficiently. In [our] exercise of that responsibility, we have determined that the time and potential expense of trial may be unnecessary to our disposition of the case. The April 27 Order suggests the possibility of our deciding the case in respondent's favor on the ground that the partnership's contribution of the easement to the Conservancy does not satisfy section 170(h)(5)(A)'s perpetual protection requirement because, as stated in that order, "proceeds from the condemnation of the Building attributable to the easement could be used to satisfy indebtedness owed by the partnership". If the partnership is not entitled to any deduction for its contribution of the easement because of a failure to satisfy the mortgage subordination requirement provided in section 1.170A-14(g)(2), Income Tax Regs., the easement's value on the date of the contribution--the issue that we understand would be the trial's principal focus--would be moot. Therefore, with this order, we are directing the parties to proceed in a manner that would allow the resolution of a potentially dispositive legal issue before any trial of the case.

H.     Petitioner's Initial Response to the Show Cause Order

In its initial response to the show cause order, petitioner made three principal

arguments. First, it claimed that the April 27 order reflected an erroneous

interpretation of the subordination agreements. Second, petitioner claimed the

**[\*32]** mortgage subordination issue could not be resolved without trial. And third, petitioner accused us of failing to "recognize the fact that mortgagee rights to insurance proceeds only arise in foreclosure."

The error of interpretation to which petitioner referred involved the scope and effect of the proviso set forth in clause (ii) of section 1 of the subordination agreements. In the April 27 order, we stated: "Because the proviso appears only in the second of three numbered clauses within section 1, we interpret the proviso as applying to, and limiting the scope of, only the rule appearing in clause (ii)."

Petitioner invoked California law for the proposition that contracts must be interpreted so as to effect the intention of the parties. And it submitted two declarations as evidence of the parties' intent: one of Robert Olson, a senior tax counsel at the Sherwin-Williams Co., an investor in the partnership, and the other of Allen Gross, petitioner's president. (Notwithstanding its submission of the two declarations, petitioner's argument that resolution of the mortgage subordination issue by summary judgment would be inappropriate apparently rests on the premise that open questions remain about the parties' intent.)

Each declaration includes identical statements about the parties' intentions concerning the deductibility of the partnership's contributions and the effect of the proviso in section 1 of the subordination agreements. Each declaration states that

[*33] "the Partnership and all lenders intended that all documents and agreements comply with applicable tax laws, including regulations, in effect at the time so that a tax deduction * * * would be permitted for the Partnership's charitable easement donation". In addition, each declaration states "that the * * * proviso * * * in Section 1 of the subordination agreements was intended to apply to clauses (i) and (ii)".

In challenging the interpretation of the proviso stated in the April 27 order, petitioner also suggested that reading the proviso as applicable only to clause (ii) would make no sense because assignments of leases and rents "are unrelated to the destruction and casualty events that would cause an extinguishment under Section 11.2" of the easement deed. Further, petitioner advised us that, "[w]hen the parties drafted the Subordination Agreements and Deeds at issue in this case, they relied on the Model [Easement] for language and structure." According to petitioner, a comparison of the language of its subordination agreements with that of the subordination provision included in the Model Easement supported its position that "it was never the intent of contract drafters that the Proviso would not apply to clause (i) in paragraph 1 of the Subordination Agreement."

[*34]  I.    <u>The August 12 Order Addressing the Parties' Initial Responses to the Show Cause Order</u>

On August 12, 2021, after we had received an initial response to the show cause order from each party, we issued another order (August 12 order) advising the parties that "petitioner ha[d] not convinced us that the partnership's contribution of the easement satisfied the mortgage subordination requirement of section 1.170A-14(g)(2), Income Tax Regs., or that the resolution of that issue turns on genuine questions of material fact that must be resolved by trial." Nonetheless, in recognition of the potentially dispositive impact of the mortgage subordination issue, we gave the parties the opportunity to supplement their responses to the show cause order or request an evidentiary hearing.  Neither party requested an evidentiary hearing, but petitioner submitted a supplemental response to the show cause order.

Evaluating the arguments petitioner advanced in its supplemental response to the show cause order is the principal task remaining before us.  Before turning to that task, however, we will review the assessment of petitioner's initial response that we provided in the August 12 order.

Regarding the alleged error of interpretation reflected in the April 27 order denying petitioner's motion for partial summary judgment, we acknowledged that placement of the proviso in section 1 of the subordination agreements within

**[\*35]** clause (ii) of that section appeared to be a "drafting error."[7] In reaching that conclusion, we relied primarily on our comparison of the language of the subordination agreements in issue with that of the subordination provision included with the Model Easement.[8] We disagreed with petitioner, however, that the proviso, interpreted to apply to clause (i), would establish adequate grounds for distinguishing the present case from Palmolive Bldg. Inv'rs. "[E]ven if we were to accept that the lenders' priority rights were subject to the proviso," we wrote, "we would not read the proviso as subordinating those rights to the Conservancy's interest in the Building."

---

[7]In its initial response to the show cause order, petitioner advised us that it was "working to support [its interpretation of the proviso] with additional affidavits from other parties to the contracts at issue." It also expressed its intention to "develop and submit at trial evidence supporting its interpretation of the Proviso including evidence related to the intent of the parties to the agreement at issue." Because we accept petitioner's interpretation that the proviso should be read to apply to clause (i) of section 1 of the subordination agreements, either instead of or in addition to clause (ii), we have no need for additional evidence on that point.

[8]In the proposed language for mortgage subordination included in the Model Easement, the proviso appears in paragraph 26(a), which corresponds to clause (i) of section 1 of the subordination agreements in issue. The proviso is not repeated in paragraph 26(b), which corresponds to clause (ii).

[*36] We observed that "[t]he proviso * * * simply clarifies that section 11.2 of the [easement] Deed must be taken into account in determining the allocation of insurance proceeds."  We continued:

> Under the plain terms of section 11.2, the sale or insurance proceeds in which the Conservancy would be entitled to share would be those remaining "after the satisfaction of prior claims."  That those prior claims would include claims of the Lenders is confirmed by the last sentence of section 11.2, stating that any lien arising from that section to secure payment of the proceeds would not "jeopardize the priority" of mortgagees.

We also observed that, when allocating condemnation rather than insurance proceeds, section 11.3 of the easement deed would need to be consulted.  Although the proviso does not cross-reference section 11.3, that omission, we noted, appeared to be another drafting error:

> [T]he proviso included in the subordination provision of the Model Easement cross-references both the deed provision addressing extinguishment and the provision addressing condemnation.  The proviso in the subordination agreements before us obviously includes an error of some sort.  The proviso's reference to "Sections" (plural) is inconsistent with the reference to 11.2 alone.  Comparing the subordination agreements in issue with the subordination provision in the Model Easement suggests that the error was not in the use of the plural "Sections" but instead in the omission of "and 11.3".

We noted that, "[a]s in the case of an extinguishment not resulting from condemnation, the condemnation proceeds in which the partnership and Conservancy would be entitled to share under the terms of section 11.3 of the

**[*37]** [easement] Deed would be those remaining '[a]fter the satisfaction of prior claims'". We also pointed out that, under the express terms of section 11.3, the rights of the partnership and Conservancy to participate in condemnation proceedings is "subject to the rights of any Lender". We took the quoted phrase (which does not appear in the provision of the Model Easement analogous to section 11.3) as confirmation "that the debts of the partnership secured by mortgages on the Building are among the 'prior claims' that must be satisfied before the partnership and Conservancy divide any remaining condemnation proceeds."

In responding to petitioner's insistence that summary judgment was inappropriate because of open questions about the parties' intent, we began with the observation that petitioner had "complete[d] its second about-face in just over five months." As described supra part II.E., when petitioner sought to prevent respondent from addressing the mortgage subordination issue, it insisted that the issue would raise "myriad" "complex" questions of fact. Petitioner's continued pursuit of summary judgment after we had granted respondent's motion for leave to address the mortgage subordination issue, however, implicitly rested on the premise that the issue of the partnership's compliance with the perpetual protection requirement of section 170(h)(5)(A) did not require resolution of genuine questions

**[*38]** of material fact and that petitioner was entitled to judgment on that issue as a matter of law. Then, with its initial response to the show cause order, petitioner asserted the need for trial to resolve factual questions whose existence it had implicitly denied just four months earlier.

We also observed that the parties' interests "were hardly uniform." We accepted that the Lenders did not oppose "the partnership's realization of a tax deduction for its contribution of the easement." But we inferred that their "enthusiasm for cooperating" would have been "influenced by the degree to which they were being asked to prejudice their interests." We went on to explain:

> [T]he relevant question is not the parties' intentions regarding the partnership's achievement of a tax deduction but instead their intentions regarding the allocation of insurance or condemnation proceeds. The parties' intentions regarding specific respects in which the lenders' rights might be subordinated would have been influenced by their perception of section 170's requirements when the partnership made its contribution. Given the state of the law in 2007, the partnership might have interpreted section 1.170A-14(g)(2), Income Tax Regs., as being satisfied as long as an easement would survive foreclosure on any mortgages encumbering the subject property. The partnership before the Court in <u>Palmolive Bldg. Inv'rs, LLC v. Commissioner,</u> 149 T.C. at 395-396, made just that argument. Although we rejected that argument, we did not issue our opinion in that case until almost ten years after the partnership before us made its contribution. * * * Therefore, accepting the rather obvious proposition that the partnership intended to get the benefit of a tax deduction for its contribution, and that the lenders were--at least up to a point--willing to prejudice their interests to help the partnership achieve that objective, does not establish that the parties jointly intended that the Conservancy would be entitled to a share of the

[*39] proceeds of insurance or condemnation commensurate with its interest in the Building even if the remaining proceeds were inadequate to satisfy the debts secured by the mortgages on the Building.

Petitioner's third argument in its initial response to the show cause order rested on the premise that "mortgagee rights, if any, to proceeds are limited to times when the property is <u>in foreclosure</u>."  Petitioner complained that the April 27 order "failed to discuss at all" that purported limitation on the Lenders' rights.

As we explained in the August 12 order, "[p]etitioner apparently view[ed] clause (i) of section 1 of the subordination agreements as the source of any priority rights the lenders might have to insurance or condemnation proceeds."  Because section 1 begins with the phrase "[i]n the event of foreclosure", petitioner apparently viewed the priority rights referred to in clause (i) as arising only in that circumstance.

As we explained in the August 12 order:  "Petitioner misses a basic point: The lenders' priority rights are not grounded in section 1 of the subordination agreements.  Those rights are defined in the deeds of trust * * *.  The subordination agreements serve only to limit (or subordinate), in specified respects, the rights granted to the lenders in the deeds of trust."[9]

_____

[9]Petitioner attached the deeds of trust to its initial response to the show cause order but made little effort, in that response, to analyze their terms.  "The deeds of

**[*40]** III.   <u>Petitioner's Supplemental Response to the Show Cause Order</u>

We have now provided petitioner three opportunities to present whatever arguments it might have as to why the Lenders sufficiently subordinated their rights in the Building to those of the Conservancy to satisfy the mortgage subordination requirement of section 1.170A-14(g)(2), Income Tax Regs.  We spelled out in detail in the April 27 order and the August 12 order why we found unpersuasive the arguments petitioner advanced in its response to respondent's supplemental response to petitioner's motion for partial summary judgment and in its initial response to the show cause order.  We now consider the arguments petitioner advanced in its supplemental response to the show cause order, to the extent that they do not merely duplicate arguments we have already rejected.

Petitioner's supplemental response to the show cause order, as we read it, makes four principal points.  First, petitioner asserts that the Lenders would be required to use any insurance proceeds arising from casualty damage to the Building or any proceeds from the Building's condemnation to repair or rebuild the

---

trust", petitioner contended, "speak for themselves."  Petitioner judged "some * * * language" in the deeds as "highly favorable" to its position but did not identify the provisions it had in mind.  "To the extent that any deed of trust contains language unhelpful to Petitioner", it averred, "the Subordination Agreements were drafted and signed to help ensure that a charitable deduction would be available to Petitioner for federal income tax purposes."

**[*41]** property.  The City deeds themselves, as petitioner reads them, impose that requirement on the City and Agency.  And, according to petitioner, the result would be the same under the GMAC deeds of trust, after taking into account California law and regulations issued by the Department of Housing and Urban Development (HUD).

Next, petitioner advances two separate reasons the subordination agreements executed by the Lenders satisfy the requirements of section 1.170A-14(g)(2), Income Tax Regs.  First, petitioner suggests that satisfaction of section 1.170A-14(g)(2), Income Tax Regs., requires only that a conservation easement survive foreclosure on a mortgage.  To the extent that mortgagees retain a priority right to insurance or condemnation proceeds, petitioner reasons, that would implicate the requirements of section 1.170A-14(g)(6), Income Tax. Regs., but not those of subparagraph (2).  And petitioner asserts that respondent has conceded that the requirements of subparagraph (6) have been satisfied.

Petitioner's second argument for why the subordination agreements satisfy subparagraph (2) relies, again, on the proviso included in section 1 of the subordination agreements.  Petitioner contends that, in the proviso, "[t]he beneficiaries of the Deeds of Trust expressly subordinate their rights to Grantee's share of * * * [insurance or condemnation] proceeds".  Treating the Lenders'

[*42] priority rights to insurance or condemnation proceeds as "prior claims" that would reduce the proceeds to be shared between the partnership and the Conservancy, petitioner reasons, "would render the 'proviso,' * * * as circular nonsense having no effect at all."

Finally, although not directly relevant to the legal question of whether the partnership's gift to the Conservancy complied with section 1.170A-14(g)(2), Income Tax Regs., petitioner lodges two complaints about our handling of its case. First, petitioner disputes our observation that it completed two about-faces in a matter of months. That characterization, petitioner alleges, "is not supported by the record and is unfair." In petitioner's view, its changes in position should be understood as responses to "new issues" raised by the Court. Second, petitioner accuses us of having effected "a perversion of the principle of party representation." We assume that petitioner means to refer to the principle of party presentation. Under that principle, courts generally rely on the parties before them to "frame the issues for decision". United States v. Sineneng-Smith, 590 U.S. ___, ___, 140 S. Ct. 1575, 1579 (2020) (quoting Greenlaw v. United States, 554 U.S. 237, 243 (2008)). Petitioner contends that we inappropriately expected it "not only [to] respond to issues raised in Respondent's briefing but also to anticipate and essentially pre-respond to any new issues that might be introduced by the Court."

**[*43]** We address below each of the four points petitioner made in its supplemental response to the show cause order.

IV.   Analysis

    A.   The Lenders' Rights to Insurance or Condemnation Proceeds

Petitioner significantly overstates the case in claiming that the deeds of trust require the Lenders, in all circumstances, to use insurance or condemnation proceeds to repair or restore the Building.  Petitioner asserts that "[t]he City Deeds of Trust unambiguously require the beneficiary to use proceeds of a casualty or condemnation to repair or rebuild the property."  That assertion is accurate only in regard to insurance proceeds.  The City deeds of trust require the Lender to use condemnation proceeds to repair or preserve the Building only to the extent "reasonable and necessary".

Each GMAC deed of trust gives GMAC the option of allowing insurance or condemnation proceeds to be used for the repair or restoration of the Building.  We therefore accept that, under Milstein and Schoolcraft, the covenant of good faith and fair dealing implied in the GMAC deeds of trust would prevent GMAC from using insurance or condemnation proceeds to satisfy the indebtedness secured by its mortgage on the Building unless GMAC could demonstrate an impairment of its security.

**[*44]** Nonetheless, petitioner again overstates the case when it claims that "[t]he GMAC Deeds of Trust, as applied in accordance with applicable California law and applicable * * * regulations [issued by HUD], * * * require the beneficiary thereunder to use proceeds of a casualty or condemnation to repair or rebuild the property." The implied duty of good faith and fair dealing, as interpreted by California law, would allow GMAC to exercise its right to use insurance or condemnation proceeds to satisfy the indebtedness secured by its mortgages to the extent that it could demonstrate that the casualty or condemnation impaired the security for that indebtedness. Petitioner asserts that HUD regulations "require, in cases where a HUD loan is not delinquent, that any insurance proceeds be used to repair the property." Even if we were to accept petitioner's assertion as accurate, it does not follow that HUD would not, in any circumstance, approve the use of condemnation proceeds to repay the indebtedness secured by the deeds of trust in GMAC's favor.[10]

---

[10]Petitioner claims that "applicable regulatory guidance of HUD * * * prohibit[s] the Beneficiaries under the GMAC Deeds of Trust to use proceeds derived from a * * * condemnation to satisfy outstanding indebtedness (beyond curing a delinquency) rather than repair or rebuild the property." Petitioner cites no regulations, however, that address the use of condemnation proceeds. Section 21 of the GMAC deeds of trust allows GMAC to apply condemnation proceeds to amounts due under the debt secured by the mortgages with the approval of the HUD Secretary. If GMAC were required in all events to use

**[*45]** Petitioner notes that "further factual development would be appropriate" were we to "believe[] that there is any question remaining regarding the proper interpretation of the GMAC Deeds of Trust," but it identifies no such question. Nor do we see any material question remaining regarding the interpretation of the GMAC deeds of trust. Those deeds contemplate circumstances in which GMAC would be able to use condemnation or insurance proceeds to satisfy the indebtedness secured by GMAC's mortgages. Again, petitioner's claim that GMAC would be required, in all possible circumstances, to allow those proceeds to be used for repair or rebuilding contravenes the plain terms of the deeds of trust and the subordination agreements.

The circumstances in which a Lender would be required to allow insurance or condemnation proceeds to be used for repair or rebuilding are not exhaustive. At least in some circumstances, the Lender could exercise its right to apply those proceeds to satisfy the debt secured by its mortgage on the Building.

Moreover, the circumstances enumerated by petitioner in which the proceeds of insurance or condemnation would be required to be used for repair or rebuilding are beside the point. In those circumstances, the Lenders would not have a priority

---

condemnation proceeds to repair or rebuild the property--even, for example, in a case in which the Building were wholly condemned--that language in section 21 of the GMAC deeds of trust would be superfluous.

[*46] right over the Conservancy. Instead, the proceeds would be used for the benefit of all who hold interests in the property. A right never granted need not be subordinated. In determining whether the partnership's gift of the easement satisfies the mortgage subordination requirement of section 1.170A-14(g)(2), Income Tax Regs., our focus must be on those rights of the Lenders that, in the absence of an agreement to the contrary, would impinge on the Conservancy's rights to enforce the gift's conservation purposes. If under any circumstances that have at least a material chance of occurrence the Lenders would have a priority right over the Conservancy to insurance or condemnation proceeds that the Lenders did not agree to subordinate to the Conservancy, the requirement of section 1.170A-14(g)(2), Income Tax Regs., as interpreted in Palmolive Bldg. Inv'rs, would be violated. The number of circumstances in which the Lenders would not have a priority right would be of no moment.

Petitioner contends that, "[t]o the extent there may be any scenario where proceeds derived from a casualty or condemnation might not be applied to complete repairs, it would be remote as defined in Treasury Regulations Section 1.170A-14(g)(3)." As we explained in Palmolive Bldg. Inv'rs, LLC v. Commissioner, 149 T.C. at 403: "Paragraph (g)(3) of section 1.170A-14 is not an alternative provision on which taxpayers may rely if they otherwise fail to satisfy

**[\*47]** the express requirements of paragraph (g)(2) or (g)(6)." (Fn. ref. omitted.)

"[R]egularly occurring circumstances that are expressly foreseen and are explicitly

provided for in the regulations (i.e., mortgages and extinguishment proceeds)", we

added, "are by their nature <u>not</u> 'remote', and the specific requirements in the

regulations as to those contingencies are not affected by paragraph (g)(3)." <u>Id.</u>

Section 1.170A-14(g)(2), Income Tax Regs., requires a mortgagee to

subordinate "its rights in the property"--not merely those rights sufficiently likely

to arise. Thus, read in accordance with its plain terms, the requirement in the

regulations would be violated if the Lenders were able, in any circumstance, to

apply insurance or condemnation proceeds to satisfy the partnership's indebtedness

before any amounts would be paid to the Conservancy. The likelihood of any such

circumstance's arising would be irrelevant.

Nonetheless, <u>Palmolive Bldg. Inv'rs</u> can be read to suggest a less strict

reading of the regulation. "Receiving proceeds in the event of a condemnation",

we wrote, "is a critical right and interest of the mortgagee; and if that right and

interest is not subordinated, then the donee's 'property right' to proceeds is

undermined." <u>Palmolive Bldg. Inv'rs, LLC v. Commissioner</u>, 149 T.C. at 398.

Our observation could be read to imply that subordination of all "critical" rights

**[\*48]** and interests would be sufficient, even if other rights or interests remain unsubordinated.

Following that approach would require a means of distinguishing between those rights and interests that are critical and those that are not. The most obvious means of doing so would be to assess the likelihood of those rights' arising. Therefore, even though section 1.170A-14(g)(3), Income Tax Regs., does not excuse noncompliance with the mortgage subordination requirement, the principles underlying that provision could perhaps be applied analogously in determining whether the mortgage subordination requirement has been met.

Even under a more flexible reading of the regulations along the lines described above, however, we would reject petitioner's argument that the circumstances in which the Lenders' retained priority rights over insurance or condemnation proceeds are "so remote as to be negligible." Sec. 1.170A-14(g)(3), Income Tax Regs. As we explained in Palmolive Bldg. Inv'rs, LLC v. Commissioner, 149 T.C. at 403-404:

> Even if analyzing the "remote[ness]" of the contingencies were appropriate here, it would not save Palmolive's deduction, since the relevant contingencies were manifestly not remote. "[S]o remote as to be negligible" has been defined to refer to "a chance which persons generally would disregard as so highly improbable that it might be ignored with reasonable safety in undertaking a serious business transaction." United States v. Dean, 224 F.2d 26, 29 (1st Cir. 1955). In this case, however, the parties did foresee, and in the Deed they did

[*49] make provision for, the contingency that it would not be possible both to satisfy outstanding mortgage obligations and to pay the easement donee the full amount of the "Conservation Right Percentage"; otherwise, the Deed would not provide * * * that the "net proceeds" from which the donee's "Conservation Right Percentage" would be funded "shall specifically exclude any preferential claim of a Mortgagee". The parties themselves--Palmolive and the mortgagees--did not disregard or ignore these contingencies but addressed them explicitly. They were not "so remote as to be negligible".

The same analysis applies here. As explained above, the deeds of trust contemplate circumstances in which the Lenders would be able to apply insurance or condemnation proceeds against the partnership's debt rather than allowing those proceeds to be used to fund repair or rebuilding. GMAC could use insurance or condemnation proceeds to satisfy the partnership's indebtedness, at least with HUD's approval, if it demonstrates that the event that led to the proceeds had impaired its security. And the City or the Agency could use condemnation proceeds to satisfy the partnership's debt when repair or preservation of the Building would not be "reasonable and necessary". Clause (i) of section 1 of the subordination agreements expressly retains those priority rights granted in the deeds of trust. The proviso's cross-reference does not defeat those rights. Were the parties to have disregarded those circumstances in which the Lenders would not be required to allow insurance or condemnation proceeds to fund repair or

**[*50]** rebuilding, much of the language in the relevant documents would have been unnecessary.

    B.    <u>Respondent's Purported Concession</u>

Petitioner insists that our interpretation of section 1.170A-14(g)(2), Income Tax Regs., is constrained by what it views as respondent's concession that the easement deed satisfies the requirements of subparagraph (6). Petitioner's reasoning, as we understand it, runs as follows: Section 1.170A-14(g)(2), Income Tax Regs., cannot be read to require any particular allocation of proceeds upon the extinguishment of an easement because a separate subparagraph of the regulation, subparagraph (6), addresses that question. The two separate subparagraphs, in petitioner's view, cannot be read to overlap to any extent. The upshot of petitioner's argument seems to be that the mortgage subordination requirement of subparagraph (2) requires only that an easement survive foreclosure on any mortgages. If the Lenders have not adequately subordinated their priority rights to insurance or condemnation proceeds, petitioner reasons, that might violate subparagraph (6) but cannot be viewed as a violation of subparagraph (2). And, again, petitioner contends that respondent has conceded that the easement deed satisfies the requirements of subparagraph (6).

[*51] The short response to petitioner's argument is: Respondent did not make the concession petitioner imagines him to have made. Petitioner's allegation to the contrary is apparently based on respondent's failure to specifically mention section 1.170A-14(g)(6), Income Tax Regs., in his unilateral list of unresolved issues included in the February 22 stipulation. That stipulation demonstrated the failure of our efforts to get the parties to narrow the issues for trial. The parties proved unable to agree even on what they did not agree on. The February 22 stipulation lists only one issue that the parties jointly accepted as remaining for trial: "the value of the easement donated by petitioner." As noted above, respondent's list of unagreed issues in the February 22 stipulation included the issue of "[w]hether the Deeds of Trust encumbering the building were properly subordinated, as required by I.R.C. § 170(h)(5)(A) and Treas. Reg. § 1.170A-14(g)(2), at the time of the donation." Therefore, respondent identified the issue of the adequacy of subordination of the mortgages that encumbered the Building. He cited the Code section under which that issue arises. And he cited the regulation provision that specifically addresses mortgage subordination. The prospect that respondent's description of the issue was incomplete because he did not mention another potentially relevant provision of the regulations is of no consequence because

[*52] respondent's unilateral list of issues was not part of a joint stipulation as envisioned by the January 8 order.

Even if we were to accept that respondent should be treated as having conceded any issue other than the value of the easement not set forth in his unilateral list of unagreed issues, we would view respondent's identification of the mortgage subordination issue as sufficient. Petitioner, in seeking to hold respondent to what would at most be a foot-fault seeks to artificially divide the question of mortgage subordination into two separate issues, governed by separate provisions of the regulations. But those provisions, at least in regard to the allocation of insurance or condemnation proceeds, are inextricably related. Section 1.170A-14(g)(6), Income Tax Regs., provides that the extinguishment of an easement will not violate the "protected in perpetuity" requirement of section 170(h)(5)(A) if the donee receives a share of the proceeds commensurate with its interest in the property and uses those proceeds "in a manner consistent with the conservation purposes of the original contribution." But subparagraph (6) does not define the quantum of "proceeds" in which the donee must share. In respondent's supplement to response to petitioner's motion for partial summary judgment (lodged before the February 22 stipulation), his complaint was not that the Conservancy's specified share in proceeds is less than its proportionate interest in

**[\*53]** the property, but instead that the proceeds in which the Conservancy is entitled to share may be reduced, in circumstances that have a material likelihood of occurring, by the claims of the Lenders. To the extent that the reduction of the extinguishment proceeds by mortgagees' claims violates section 170(h)(5)(A), respondent adequately identified that issue in the February 22 stipulation by citing section 1.170A-14(g)(2), Income Tax Regs., as well as section 170(h)(5)(A).

C.     The Section 1 Proviso

Contrary to petitioner's claim, the Lenders did not "expressly subordinate" their claims to rights of the Conservancy in the proviso that appears in section 1 of the subordination agreements. The proviso simply cross-references "[s]ections 11.2" of the deed of easement. It reads, in its entirely, as follows: "[P]rovided, however, that if the Easement is extinguished under the circumstances described in Sections 11.2 of the Granting Deed, Grantee shall be entitled to compensation in accordance with the terms set forth therein". We assume the proviso should have cross-referenced both section 11.2, dealing with extinguishment, and section 11.3, which addresses condemnation. In any event, the proviso includes no express subordination; it merely clarifies that, if the easement is extinguished or the Building condemned, then, notwithstanding the Lenders' retention (in clause (i) of section 1 of the subordination agreements) of those priority rights to insurance or

[*54] condemnation proceeds granted to them in the deeds of trust, the Conservancy would "be entitled to compensation in accordance with the terms set forth" in section 11.2 or 11.3 of the easement deed, as applicable.

Under the terms of section 11.2 of the easement deed, the proceeds to which the Conservancy would be entitled upon the easement's extinguishment would be its proportionate share of any "net proceeds" remaining "after the satisfaction of prior claims and any costs or expenses".  (Section 11.3 includes similar language, entitling the Conservancy to "the balance of the recovered proceeds" "[a]fter the satisfaction of prior claims and net of expenses".)  Therefore, whether the Lenders subordinated to the Conservancy the priority rights granted to them in the deeds of trust turns on whether the claims secured by the deeds of trust are "prior claims" within the meaning of sections 11.2 and 11.3.

Petitioner argues that the Lenders' priority rights to insurance and condemnation proceeds granted under the deeds of trust, and expressly retained by clause (i) of section 1 of the subordination agreements, must be excluded from the definition of "prior claims", as used in sections 11.2 and 11.3.  Why?  Because, otherwise, the proviso would be "circular nonsense".  According to petitioner, "[t]he * * * language of the proviso may be reasonably interpreted (and given any

[*55] meaning at all) only if it is construed as protecting the recipient of the gift ahead of the lender."

Petitioner's argument on what we regard as the key issue in the case-- whether the Lenders' priority rights to insurance or condemnation proceeds are "prior claims" within the meaning of sections 11.2 and 11.3 of the easement deed-- is notably sparse. By starting from the premise that the proviso must be read as an exception to clause (i), rather than merely a cross-reference to provisions of the easement deed that also address the apportionment of insurance or condemnation proceeds, petitioner assumes the point in issue. The priority rights to those proceeds granted to the Lenders would be "prior claims" under the normal meaning of that phrase (that is, claims prior in right to the rights of the Conservancy and the partnership) unless the Lenders agreed to subordinate their claims. In short, the claims are "prior claims" unless subordinated. But, says petitioner, the claims are subordinated because they are not "prior claims". Petitioner's reasoning is, in a word, "circular". Moreover, under petitioner's reading of the proviso as an exception to clause (i), the exception would swallow the rule. The priority rights purportedly retained under clause (i) would not be retained at all.

**[*56]** Petitioner's reading of the relevant documents also ignores the last sentence of section 11.2 of the easement deed. That sentence creates a lien in favor of the Conservancy and the partnership to secure the payment of their respective shares of any net proceeds from the easement's extinguishment. But that same sentence states that the lien in favor of the Conservancy and the partnership "shall not jeopardize the priority" of the Lenders' mortgages.[11] That the parties expressly provided that the mortgages would retain priority over the lien created by section 11.2 of the easement deed to secure payment of the Conservancy and the partnership's shares of any net proceeds from extinguishment demonstrates that the parties intended the Lenders' claims to be "prior claims" within the meaning of that section.

In addition, petitioner's reading of the relevant documents ignores the language in section 11.3 of the easement deed to the effect that the Conservancy and the partnership's right to join in condemnation proceedings and share in any resulting proceeds is "subject to the rights of any Lender". As noted above, the quoted phrase does not appear in the provision of the Model Easement analogous

---

[11]We called attention to the last sentence of section 11.2 of the easement deed in the August 12 order. Nonetheless, in the supplemental response to the show cause order that petitioner submitted on August 26, 2021, it made no mention of that sentence.

[*57] to section 11.3 of the easement deed in issue (although, in every other respect, the language of the two provisions is identical). In adding that phrase to section 11.3, the parties went out of their way to emphasize that any priority right to condemnation proceeds provided to a Lender in the deed of trust issued in its favor was a "prior claim" that would reduce the proceeds to be shared under that section between the Conservancy and the partnership.[12]

Moreover, section 7.3(d) of the easement deed confirms that, at least in some circumstances, the Lenders would have a "prior claim * * * to * * * insurance proceeds." Thus, the language of that section flatly contradicts petitioner's position that the lenders' claims to insurance proceeds cannot qualify as prior claims.[13]

---

[12]We also noted in our August 12 order the implication of the parties' addition to the language in the Model Easement provision addressing condemnation. In its supplemental response to the show cause order, petitioner ignored that additional language.

[13]Section 7.3(d), again, provides, in language substantively identical to paragraph 9(d) of the Model Easement: "Whenever the Property is encumbered with a mortgage or deed of trust, nothing contained in this Section shall jeopardize the prior claim, if any, * * * to the insurance proceeds." The phrase "if any", as we read it, acknowledges that the status of a claim to insurance proceeds as a prior claim would depend on the specific terms of the mortgage or deed of trust. When those documents provide the lender with a priority right to insurance proceeds, however, section 7.3(d) confirms that that right is a prior claim.

**[*58]** Petitioner's reading of the relevant documents faces yet another problem. If a Lender's claim to apply insurance or condemnation proceeds to satisfy the indebtedness of the partnership is not a "prior claim", it would not reduce the "net proceeds" to be shared between the Conservancy and the partnership under section 11.2 or 11.3 (as applicable). The Conservancy and the partnership would share those net proceeds "in accordance with their respective interests in the fair market value of the Property, as such interests are determined under the provisions of Section 11.1". The Conservancy and the partnership's proportionate interests in the property, as determined under section 11.1 of the easement deed, sum to 100%: The Conservancy's proportionate interest in the property is the ratio of the value of the easement to the value of the property as a whole, determined as of the date the partnership granted the easement. The partnership's proportionate interest in the property is the complement of the Conservancy's interest. Therefore, if the Lenders' claims are not "prior claims", within the meaning of sections 11.2 and 11.3 of the easement deed, then the Conservancy and the partnership would share between them any proceeds of insurance or condemnation remaining after the payment of expenses and any claims that <u>are</u> prior claims. Under petitioner's proposed reading of the relevant documents, the Lenders would have subordinated their priority rights to insurance or condemnation proceeds not only to the

[*59] Conservancy but to the partnership as well. Petitioner offers us no explanation for why the Lenders would have agreed to that result.[14]

Mr. Gross' declaration addresses the easement's intended duration and the Conservancy's right to share in insurance and condemnation proceeds but does not cover the precise issue at hand. Mr. Gross declared: "It was my intent, and I believe that it was the intent of all the other parties involved * * * that the easement was effective forever, and in perpetuity. There would never be a break of perpetuity, but if there was ever a condemnation or a destruction of the building, then the LA Conservancy would get the benefit (pro-rate [sic] share) of the proceeds."

The intent of the parties regarding the easement's perpetuity is not in issue. We accept that the parties intended the easement to be perpetual. But the easement's duration was not entirely within their control.

The question we face is the allocation of proceeds in the event that the Building, contrary to the parties' intent, is damaged, destroyed, or condemned.

---

[14]Our August 12 order also pointed out the consequence noted in the text of treating the references to "prior claims" in sections 11.2 and 11.3 of the easement deed as excluding the Lenders' claims to insurance or condemnation proceeds. And petitioner again failed to address the point in its supplemental response to the show cause order.

**[\*60]** Sections 11.2 and 11.3 of the easement deed demonstrate the parties' intent that, in such an event, the Conservancy would share available proceeds with the partnership. The issue before us is whether the rights of the Lenders to use those proceeds to satisfy the partnership's indebtedness would reduce the proceeds to be shared between the Conservancy and the partnership. Again, Mr. Gross' declaration does not address that point.

The better reading of the relevant documents, by far, is that the parties believed mandating that the easement would survive foreclosure of the mortgages would be sufficient to satisfy the mortgage subordination requirement of section 1.170A-14(g)(2), Income Tax Regs.[15] We rejected that view in Palmolive Bldg. Inv'rs, LLC v. Commissioner, 149 T.C. at 395-396. In an effort to avoid the precedent established by our Opinion in that case, petitioner advances a tortured reading of the relevant documents. In addition, petitioner has repeatedly professed to "reserve[] the right to argue that Palmolive was wrongly decided".[16] Despite

---

[15]The Model Easement and its recommended subordination language seems to reflect that same belief.

[16]The language quoted in the text is from petitioner's response to respondent's supplement to his response to petitioner's motion for partial summary judgment, which petitioner submitted on March 29, 2021. In its initial response to the show cause order, submitted more than four months later, petitioner again "reserve[d] the right to argue * * * that Palmolive was wrongly decided."

[*61] having had ample opportunity, however, petitioner has not marshalled any clear argument to that effect.[17]

D. The Court's Role in the Proceedings

Petitioner does not deny its marked changes in position within a relatively brief period in regard to whether resolution of the mortgage subordination issue turns on genuine questions of material fact. Petitioner suggests, however, that its about-faces can be explained as responses to our having, perhaps improperly, raised new issues. Petitioner's initial reversal came when it continued to pursue its motion for partial summary judgment after we had granted respondent leave to address the mortgage subordination issue. As described above, when petitioner sought to prevent consideration of that issue, it claimed that resolution of the issue would turn on a "myriad" "complex" factual questions concerning the execution and interpretation of relevant agreements. Nothing in our order granting respondent's motion for leave resolved those factual questions or rendered them irrelevant. Therefore, petitioner's initial reversal cannot be attributed to any action by the Court.

---

[17]In its response to respondent's supplement to his response to petitioner's motion for partial summary judgment, petitioner accused "the Palmolive court * * * [of having] create[d] its rule out of thin air", but did not elaborate on that accusation.

**[\*62]** Petitioner's second reversal came in response to our show cause order, when it insisted that resolution of the mortgage subordination issue by summary judgment was inappropriate because of unresolved factual questions. Petitioner attributes that reversal to the April 27 order, in which we "introduced an issue not previously identified in Respondent's briefs * * * [that] requir[ed] contract interpretation under California law." Petitioner is not entirely clear on just what "new" issue or issues we had raised. Given the grounds on which we denied petitioner's motion for partial summary judgment, we infer that petitioner has in mind either the effect of the proviso in clause (ii) of section 1 of the subordination agreements or the extent to which the deeds of trust issued in favor of the Lenders included language sufficiently similar to the deeds at issue in <u>Milstein</u> and <u>Schoolcraft</u> to enable petitioner to rely on those cases.

Neither of those questions was new. Each was implicated in petitioner's response to respondent's argument that the partnership's gift did not satisfy section 170(h)(5)(A)'s perpetual protection requirement because the Lenders' priority rights to insurance or condemnation proceeds had not been adequately subordinated. (Respondent could not have raised those questions because it had submitted its argument on the mortgage subordination issue before petitioner submitted its response.) The April 27 order simply explained why we were

**[*63]** unpersuaded by the arguments petitioner had advanced.  Because petitioner

had not submitted the deeds of trust in support of its motion for partial summary

judgment, it failed to demonstrate the relevance of <u>Milstein</u>, <u>Schoolcraft</u>, and

similar cases.  The question concerning the effect of the proviso is obvious from

the plain text of section 1 of the subordination agreements.  Rather than

acknowledging and addressing the issue raised by the proviso's placement,

petitioner resorted to selective quotation of section 1 that left the issue unapparent.

While we could not reasonably expect petitioner to (in its words) "pre-respond to

any new issues that might be introduced by the Court", we do not believe it

inappropriate to expect a party to anticipate and address potential objections to the

arguments it advances on the issues that <u>are</u> before the Court.

It will come as no surprise that we do not accept that we have "perver[ted]

\* \* \* the principle of party []presentation."  The principle under which Courts

generally rely on the parties to frame relevant issues "is supple, not ironclad."

<u>Sineneng-Smith</u>, 590 U.S. at ___, 140 S. Ct. at 1579.  Therefore, the principle's

application should depend, among other things, on the nature and extent of the

jurisdiction being exercised.

In the present case, our statutorily defined jurisdiction is quite broad.

Section 6226(f) requires that we "determine all partnership items of the partnership

[*64] for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item." In the exercise of that jurisdiction, we are not limited to merely accepting or rejecting the specific adjustments made in the FPAA. (Similarly, in a deficiency case, we determine the "correct amount" of a taxpayer's tax liability. Sec. 6214(a).[18]) To the extent that the principle of party presentation applies at all to a partnership or deficiency case, it necessarily gives us wide latitude. In either case, our role is not strictly limited to that of a "neutral arbiter", Sineneng-Smith, 590 U.S. at ___, 140 S. Ct. at 1579 (quoting Greenlaw, 554 U.S. at 243), or an "essentially passive instrument[] of government", id. (quoting United States v. Samuels, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of rehearing en banc)). Moreover, while we may have assumed in the present case "a modest initiating role", id., we hardly effected a "radical transformation" of the case, id. at ___, 140 S. Ct. at 1582. Although our statutory jurisdiction might have allowed to us introduce new issues

---

[18]Under sec. 6214(a), we have authority, in any case involving more than $50,000, "to redetermine the correct amount of * * * [a] deficiency even if the amount so redetermined is greater than the amount" determined by the Commissioner.

**[*65]** into the case, we have not done so.  We have merely addressed--and now decide--the issue respondent addressed in the supplement to his response to petitioner's motion for partial summary judgment (an issue that, as noted above, has been part of the case from the beginning).

In evaluating a party's arguments on an issue put before a court, that court might well identify deficiencies not raised by the other party.  Doing so would not take the court beyond its proper adjudicatory role.  That is particularly so in a case in which the court's statutory jurisdiction is as broad as that granted by section 6226(f) (or section 6214(a)).

Petitioner seems to think that its task was limited to advancing arguments more persuasive than those advanced by respondent, expecting us to ignore any deficiencies in its position not brought to our attention by respondent.  Petitioner misunderstands both its role and ours.  Petitioner must convince us that its position is correct.  See Sineneng-Smith, 590 U.S. at ___, 140 S. Ct. at 1581 (observing that "a court is not hidebound by the precise arguments of counsel").  It did so in regard to the 30-day approval provision whose interpretation was the principal focus of the proceedings until November 19, 2020, when we denied respondent's motion for summary judgment.  Despite being given several opportunities to do so, however, petitioner has not convinced us of the correctness of its position in regard

[*66] to the mortgage subordination issue. To the contrary, we conclude, for the reasons explained above, that the Lenders' rights in the Building were not subordinated to those of the Conservancy, as required by section 1.170A-14(g)(2), Income Tax Regs.

V.    Conclusion

The show cause order directed petitioner to show cause why we should not enter decision in the case in respondent's favor on the ground that the mortgages on the Building were not subordinated as required by section 1.170A-14(g)(2), Income Tax Regs. In its two responses to the show cause order, petitioner has not shown adequate cause to prevent us from making the show cause order absolute. It has not established that resolution of the legal issue of the adequacy of the mortgages' subordination turns on a genuine question of material fact. Therefore, we see no need for conducting a trial of the case. And petitioner has not convinced us that, as a matter of law, the mortgages were adequately subordinated.

We accept that, in some circumstances, the Lenders would be required to allow insurance or condemnation proceeds to be used for the Building's repair or restoration. Petitioner's enumeration of those circumstances, however, does not demonstrate the required subordination of the Lenders' claims. In those circumstances, the Lenders would have no rights that would have to be

[*67] subordinated to the rights of the Conservancy. But the deeds of trust contemplate other circumstances in which the Lenders <u>would</u> have priority rights to use insurance or condemnation proceeds to satisfy the indebtedness secured by their mortgages. Those rights <u>do</u> have to be subordinated to satisfy the requirement of section 1.170A-14(g)(2), Income Tax Regs. And they were not. In fact, clause (i) of section 1 of the subordination agreements expressly retains those priority rights to insurance or condemnation proceeds granted to the Lenders in the deeds of trust. The proviso in section 1, even if read as applicable to clause (i), states only that, upon the easement's extinguishment, the Conservancy would be entitled to compensation in accordance with the terms of section 11.2 or 11.3 of the easement deed. The compensation to which the Conservancy would be entitled under either section would be a share, proportionate to its interest in the property, of only those net proceeds remaining after the satisfaction of prior claims and the payment of expenses. Nothing in the subordination agreements or the easement deed excludes from the definition of "prior claims" those priority rights of the Lenders to insurance or condemnation proceeds expressly retained under clause (i) of section 1 of the subordination agreements. In fact, other language in the easement deed demonstrates the parties' intent that those priority rights to insurance or condemnation proceeds granted to the Lenders by the deeds of trust be

[*68] treated as "prior claims" that reduce the net proceeds to be shared between the partnership and the conservancy. Were that not the case, the Lenders would inexplicably have subordinated their rights not only to the Conservancy's but to the partnership's as well.

In short, we conclude that (1) the deeds of trust provide the Lenders with a priority right to use the proceeds of insurance or condemnation, in specified circumstances, to satisfy the indebtedness secured by the deeds of trust, and (2) the Lenders did not subordinate those priority rights to the right of the Conservancy to enforce in perpetuity the conservation purposes of the partnership's gift of the easement. Consequently, the gift cannot be treated as having been made exclusively for conservation purposes. Sec. 170(h)(5)(A); sec. 1.170A-14(g)(2), Income Tax Regs. Because the gift was not exclusively for conservation purposes, it was not a "qualified conservation contribution", within the meaning of section 170(h)(1). The partnership, having contributed a partial interest in property not covered by an exception provided in section 170(f)(3)(B), is not entitled to a deduction for the gift under section 170. Sec. 170(f)(3)(A). In accordance with the show cause order, we will therefore enter decision in respondent's favor.

<u>An appropriate order will be issued,</u>

<u>and decision will be entered for respondent.</u>